A01A0572. UPSHAW v. THE STATE.
(549 SE2d 526)

ELLINGTON, Judge.

A DeKalb County jury convicted Solomon Upshaw of numerous charges arising from a home invasion. These charges included two counts of rape, OCGA § 16-6-1; two counts of kidnapping with bodily injury, OCGA § 16-5-40 (b); one count of kidnapping, OCGA § 16-5-40 (a); four counts of aggravated assault, OCGA § 16-5-21; four counts of false imprisonment, OCGA § 16-5-41; and burglary, OCGA § 16-7-1. The rape and kidnapping charges were merged for sentencing. Upshaw appeals from the trial court's denial of his motion for new trial, contending the trial court erred in refusing to dismiss a juror for cause, in admitting evidence resulting from an unduly suggestive lineup, and in failing to merge the kidnapping and false imprisonment charges. He also challenges the sufficiency of the evidence. Because one of the false imprisonment charges should have been merged with a kidnapping charge, we reverse the false imprisonment conviction and set aside the sentence entered thereon. We affirm Upshaw's remaining convictions.

Viewed in the light most favorable to the jury's verdict, *Arnold v. State,* 243 Ga. App. 118 (1) (532 SE2d 458) (2000), the evidence showed that, early in the morning of December 15, 1998, a disabled man and his female caretaker were watching television in a bedroom of his DeKalb County condominium. The caretaker's 18-year-old daughter and a male friend were in the caretaker's bedroom. Suddenly, two intruders, Upshaw and Rashawn Howard, entered the disabled man's bedroom. Upshaw carried a gun, and Howard had a long, machete-like knife. Both intruders repeatedly asked, "Where [is] the dope? Where is the money?" while they searched the man's closet and Howard cut up his furniture. They knocked the caretaker out of her chair and tied her hands behind her back. Howard sat on her and put his knife to her back. Upshaw went to the other bedroom and kicked in the door. He forced the caretaker's daughter and her friend into the disabled man's bedroom at gunpoint and made them lie facedown on the floor. The intruders tied the victims' hands behind their backs with duct tape, a belt, and clothing. Upshaw and Howard told the man to stay on his bed and keep his eyes closed. When the man tried to peek, Howard said he would "cut [the man's] eyes out" if the man

tried to look at them again.

Eventually, Upshaw said that "since we didn't get what we came for, . . . I'm going to take this," referring to the caretaker. Upshaw took the caretaker into the other bedroom, untied her, and forced her to take off her clothes. He told her to kneel on the bed, then tied her hands to her ankles behind her back with duct tape. The caretaker testified that she repeatedly tried to look at Upshaw, even though he told her to look away, because she did not want Upshaw to shoot her in the back of the head. Howard continued to restrain the other victims, at one point holding a knife to the daughter's throat when she tried to get up.

A few minutes later, Upshaw came back into the disabled man's bedroom and got a beer from the nightstand. Upshaw took the daughter into the caretaker's bedroom, untied her, made her take off her clothes and kneel on the bed next to her mother, then tied her up like her mother. At that point, Upshaw raped the caretaker in her daughter's presence. When Upshaw was finished, he took the daughter into the bathroom and raped her. Both female victims consistently distinguished their assailants as the "light-skinned" one with the knife (Howard) versus the "dark-skinned" one who raped them (Upshaw).

While Upshaw was with the daughter in the bathroom, the caretaker jumped from the second-story window and ran, naked, to a neighbor's house. She called the police, who responded within two minutes. A police officer testified that, upon arriving at the condominium, he saw two men running out the back door and into the nearby woods. The police established a perimeter around the area. A police canine unit was called, which tracked down the two men within minutes. The assailants spontaneously told the police, "You got us," and one of them told the officers that he had a gun in his possession. The officers recovered a gun from Upshaw and found an empty knife sheath in Howard's possession.

Upshaw gave a custodial statement admitting his involvement in the aggravated assaults, kidnappings, false imprisonment, and burglary. Specifically, Upshaw admitted that he staked out the condominium before the burglary, broke into the condominium to steal money, asked the victims to give him money and drugs, kicked in the door to the caretaker's bedroom, and took the daughter and her friend into the other room and told them to get on the floor. According to Upshaw, he took the caretaker into her bedroom, tied her up, and left briefly; when he returned, the caretaker was gone. Upshaw stated that, as he fled the condominium, he saw the police and hid in some bushes, where the police captured him shortly thereafter. The statement did not mention the rapes. The trial court conducted a pre-

trial *Jackson-Denno*[1] hearing on the admissibility of Upshaw's statement and concluded it was voluntary and admissible. An audiotape of Upshaw's statement was played for the jury at trial.

The trial court also conducted a hearing on Upshaw's motion to suppress the results of a photographic lineup in which both female victims identified Upshaw as the rapist. The trial court denied the motion after finding that the lineup was not impermissibly suggestive.

1. Upshaw contends the trial court erred in refusing to dismiss a juror for cause. During voir dire, the State asked the jury panel whether anyone would have a problem sitting on a case that involved the indicted charges. Juror no. 30 raised her hand. During questioning about whether she could be fair and impartial, the juror explained that two friends had been raped "awhile back" and she believed that one friend still experienced emotional "ramifications" of the rape. When asked if she could set aside these experiences so that they did not affect her judgment in this case, she replied, "I would hope I could. I can't promise, but I would hope I could." She also stated that her concerns arose more from seeing the "long-term effects" of the rape on one of her friends than from her personal feelings about what happened to them. Counsel moved to excuse juror no. 30 for cause. The trial court denied the motion after finding that her responses during voir dire were insufficient to sustain a challenge for cause.

> Whether to strike a juror for cause lies within the sound discretion of the trial court. For a juror to be excused for cause, it must be shown that he or she holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence. A prospective juror's doubt as to his or her own impartiality does not demand as a matter of law that he or she be excused for cause. Nor is excusal required when a potential juror expresses reservations about his or her ability to put aside personal experiences. . . . A conclusion on an issue of bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province, and those findings are to be given deference.

(Citations omitted.) *Holmes v. State*, 269 Ga. 124, 126 (2) (498 SE2d 732) (1998). See also *Garland v. State*, 263 Ga. 495, 496-497 (1) (435 SE2d 431) (1993) (the trial court did not abuse its discretion in refus-

---

[1] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

ing to excuse a prospective juror who stated that she would "try" to put aside her emotions and decide the case based upon the evidence).

The juror's responses in this case did not compel a finding that she had formed an opinion of Upshaw's guilt or innocence that was so fixed or definite that she would be unable to decide the case based upon the law and the evidence. See *Corza v. State*, 273 Ga. 164, 167 (3) (539 SE2d 149) (2000) (juror repeatedly stated that she was "not certain" she could set aside her feelings of the defendant's gang affiliation, but that she "would try"); cf. *Menefee v. State*, 270 Ga. 540, 542 (2) (512 SE2d 275) (1999) (trial court abused its discretion in failing to excuse a juror who had been attacked by a man of the same race as the defendant and, therefore, held a "distinct racial bias" against the defendant). The trial court did not abuse its discretion in refusing to dismiss the juror for cause. "Additionally, the trial transcript does not show that [Upshaw] exhausted his peremptory strikes, and if he did not use all his strikes no harm would be shown and error cannot be said to exist." (Citation and punctuation omitted.) *McKenye v. State*, 247 Ga. App. 536, 537 (1) (a) (544 SE2d 490) (2001).

2. Upshaw claims the trial court erred in refusing to suppress the photographic lineup as unduly suggestive, resulting in an irreparable misidentification. Upshaw contends that he was depicted as the man with the darkest skin among all of the pictured individuals. He argues that, when interviewed by police, the two female victims said they were raped by a "dark-skinned" intruder, and implies that the photographic array was manipulated accordingly.

Upshaw presented no authority to support his assertion that a failure to match exact complexions within a racial demographic in a photographic lineup automatically requires that the lineup be excluded, and we have found none. Instead,

> [w]e use a two-part test in determining whether evidence of pre-trial identification should be excluded: The threshold inquiry is whether the identification procedure was impermissibly suggestive. Only if it was need the court consider the second question: whether there was a very substantial likelihood of irreparable misidentification. An identification procedure is impermissibly suggestive when it leads the witness to an all but inevitable identification of a defendant as the perpetrator, or is the equivalent of the authorities telling the witness, "This is our suspect." In reviewing a trial court's denial of a motion to suppress, we construe the evidence most favorably to upholding the court's findings and judgment, and we, therefore, accept the court's ruling unless clearly erroneous.

(Citations, punctuation and footnotes omitted.) *Karim v. State*, 244

Ga. App. 282, 283-284 (2) (535 SE2d 296) (2000). See also *Smith v. State*, 209 Ga. App. 540, 543 (4) (433 SE2d 694) (1993) (in determining whether the procedures were impermissibly suggestive, the court should look at the "totality of the circumstances" surrounding the identification).

During a hearing on Upshaw's motion to suppress the identification, the officer who compiled the lineup testified that he attempted to find five pictures of men in the same age group as Upshaw, with similar hair styles and skin tones. Before showing the lineup to the two female victims, the officer read to them a photographic lineup admonition form, which stated that the pictures may not reflect the true complexion of the individuals and that they may be darker or lighter than depicted.

After reviewing the photographic lineup and hearing this testimony, the trial court found that the identification procedure was not unduly suggestive. This finding is supported by the record and, therefore, is not clearly erroneous.

3. Upshaw contests the sufficiency of the evidence to support his convictions. He argues that the lineup identification evidence should have been suppressed and, absent these identifications, the evidence was insufficient for a jury to find he was involved in these crimes. When reviewing the sufficiency of the evidence on appeal,

> [w]e view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We address only the sufficiency of the evidence, and we do not weigh the evidence or determine the credibility of the witnesses. As long as there is some evidence, even though contradicted, to support each necessary element of the State's case, the jury's verdict will be upheld.

(Footnote omitted.) *Arnold v. State*, 243 Ga. App. at 118 (1).

In this case, there was substantial evidence that Upshaw was involved in these crimes, virtually negating the possibility that he was misidentified as one of the two assailants. The most compelling evidence was his custodial statement to police, in which he admitted committing many of the crimes. See *Pickren v. State*, 272 Ga. 421, 425 (6) (530 SE2d 464) (2000) (a confession is the most probative and damaging evidence). He also admitted that he was captured outside the condominium immediately after the crimes. Further, the caretaker and her daughter both testified that, of the two intruders, it was the "dark-skinned" man who raped them. Even without the lineup identification evidence, there was simply no issue as to whether Upshaw was the assailant who committed the rapes. The

evidence presented at trial was more than sufficient for a rational jury to find Upshaw guilty beyond a reasonable doubt of the crimes for which he was charged. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

4. Upshaw asserts that the facts did not support separate convictions for the kidnapping and false imprisonment of the daughter's friend. The evidence showed that Upshaw took the friend from the caretaker's room to the disabled man's bedroom, where the friend was tied up and forced to lie facedown on the floor. The friend was not moved by the assailants after that point and was released only after the assailants left the condominium.

In determining whether merger of offenses has occurred, the trial court must look to whether the different crimes are proven with the same facts. *Kellibrew v. State*, 239 Ga. App. 783, 786 (4) (521 SE2d 921) (1999). "If one crime is complete before the other takes place, the two crimes do not merge. However, if the same facts are used to prove the different offenses, the different crimes merge." (Citation and punctuation omitted.) Id. See also *Massey v. State*, 265 Ga. 632, 633 (1) (458 SE2d 818) (1995).

In this case, the evidence demonstrates that Upshaw's conviction for the false imprisonment of the daughter's friend merged with the kidnapping charge.

> The only difference between the two offenses is asportation, since false imprisonment involves holding a person unlawfully against his will, which is also an essential element of the offense of kidnapping. Thus, false imprisonment was an integral part of the kidnapping charge, requiring the same evidence except for asportation. Accordingly, the offense of false imprisonment merged with the offense of kidnapping . . . as a matter of fact, even though the offenses did not merge as a matter of law.

(Citation omitted.) *Ellis v. State*, 181 Ga. App. 630, 634 (5) (353 SE2d 822) (1987). Therefore, the trial court erred in failing to merge the false imprisonment conviction into the kidnapping conviction. Upshaw's conviction for the false imprisonment of the daughter's friend is reversed, and his sentence for that offense is set aside.

5. Upshaw also contends his convictions for the kidnapping and false imprisonment of the caretaker and her daughter merged as a matter of fact. Unlike Upshaw's convictions for the false imprisonment and kidnapping of the daughter's friend, however, each of these convictions was supported by evidence of complete, independent acts directed toward the female victims.

(a) As to Upshaw's convictions for acts against the caretaker, the

evidence showed that he held the caretaker against her will in the disabled man's bedroom. This act supported the conviction for false imprisonment of the caretaker. After the false imprisonment was complete and several intervening acts occurred, Upshaw forced the caretaker to go into her bedroom, where he raped her. These facts supported his kidnapping with bodily injury conviction. Accordingly, the trial court did not err in failing to merge these convictions. *Norris v. State*, 230 Ga. App. 492, 494 (3) (496 SE2d 781) (1998); *Johnson v. State*, 195 Ga. App. 723-724 (2) (394 SE2d 586) (1990).

(b) Similarly, Upshaw transported the daughter to the disabled man's bedroom, where she was held against her will. This evidence supported either a kidnapping or false imprisonment conviction. Compare OCGA § 16-5-40 (a) (kidnapping) with OCGA § 16-5-41 (false imprisonment). Then, Upshaw transported the daughter to her mother's bedroom and held her against her will, a separate act which also supported a kidnapping or false imprisonment conviction. Finally, Upshaw took the daughter into the bathroom and raped her, acts which supported the kidnapping with bodily harm conviction. See OCGA § 16-5-40 (b). Given these factually distinct acts, the trial court did not err in failing to merge Upshaw's convictions for kidnapping and false imprisonment of the caretaker's daughter. *Norris v. State*, 230 Ga. App. at 494 (3).

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Ruffin, J., concur.*

DECIDED MAY 29, 2001.

*Virginia W. Tinkler*, for appellant.
*J. Tom Morgan, District Attorney, Barbara B. Conroy, Assistant District Attorney*, for appellee.